ROTH STEEL TUBE COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Roth Steel Tube Co. v. Commissioner
Docket No. 517-78.
United States Tax Court
T.C. Memo 1985-58; 1985 Tax Ct. Memo LEXIS 575; 49 T.C.M. (CCH) 698; T.C.M. (RIA) 85058; February 7, 1985. *575 Petitioner purchased 62 percent of the stock of a subsidiary corporation for $553,062. Petitioner made advances to the subsidary in the amount of $3,420,000. The subsidiary ceased operations. Petitioner claimed that its loss on the amount paid to purchase the stock of the subsidiary was ordinary under the Corn Products doctrine. Further, petitioner claimed that it was entitled to a deduction for a bad debt loss for the amount of the advances which were outstanding at the time the subsidiary ceased operations. Respondent determined that these amounts represent an investment in the subsidiary and were characterized as capital losses. Petitioner attempts to support its position, in part through the introduction of credit information prepared by a third party.Respondent seeks the exclusion of this maintaining that it is hearsay. Held, under the facts of the instant case both the amounts paid to acquire the stock of the subsidiary and the advances made to the subsidiary are capital in nature and any loss is a capital loss. Held further, the credit information petitioner seeks to introduce is admissable. Frederick N. Widen and Bennet Kleinman, for the petitioner. Richard S. Bloom, *576 for the respondent. HAMBLEN
*2 HAMBLEN, Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes: Taxable Years Ended
Deficiencies
April 30, 1971
$214,769
April 30, 1972
$144,044
April 30, 1973
$114,826
April 30, 1974
$579,053
June 30, 1974
$211,431
June 30, 1975
$464,679
After concessions [1] *577 the issues for decision are (1) whether Exhibit 59, "Request for Credit Line" and "Remco Industries, Inc. Credit Line Comments," is inadmissible as hearsay evidence; (2) whether petitioner may deduct the amounts paid to acquire the stock of Remco Industries, Inc. ("Remco"), as an ordinary loss *3 under section 165(a) [2] for the taxable year ending April 30, 1974; (3) whether petitioner may deduct the amount of $2,873,814 designated as advances to Remco as a bad debt loss under section 166(a) for the taxable year ending April 30, 1974; [3] *578 (4) whether petitioner is entitled to net operating loss deductions under section 172(a) for the taxable years ending April 30, 1971, April 30, 1972, April 30, 1973, June 30, 1974, and June 30, 1975. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner was an Ohio corporation with its principal place of business in Pepper Pike, Onio, when its petition was filed in this case. Petitioner's principal business activity during the years at issue was the manufacture and sale of steel tubing. Petitioner owned all or a substantial portion of the stock of *4 several subsidiary corporations. During the taxable years ending April 30, 1973, and April 30, 1974, petitioner owned all of the stock of Toledo Steel Tube Co. ("Toledo"), Roshel Industries, Inc. ("Roshel"), and Roth American, Inc. ("American") and approximatly 62 percent of the stock of Remco. The Remco stock was publically traded on the Over-The-Counter Market. By agreement dated as of August 1, 1972, petitioner acquired 1,158,017 shares or approximately 62 percent of the issued and outstanding shares of Remco common stock. The purchase price for these *579 shares was $.4629 per share. Petitioner acquired an additional 3,032 shares of Remco common stock pursuant to a tender offer made on August 18, 1972. The purchase price for the shares acquired pursuant to the tender offer was $.50 per share, the par value of the common stock. At the conclusion of these transactions petitioner owned 1,161,049 shares of Remco common stock with a cost basis of $553,062. The amount was recorded on petitioner's General Ledger as "INVESTMENTS--REMCO INDUSTRIES." Remco was formerly the parent of American. Petitioner acquired all of the stock of American from Remco in 1971. Prior to the sale of the American stock to petitioner, American had experienced financial difficulties, and Remco planned to file a petition for an arrangement under chapter XI of the Bankruptcy Act for American. Herbert Gurbst ("Gurbst"), then a principal officer with American, convinced Remco not to file a bankruptcy *5 petition for American and began a concerted effort to save American. Gurbst was appointed as president of American. Under Gurbst's management American's gross sales and losses from operations as reported on its Forms 1120, U.S. Corporate Income Tax Returns, indicated *580 that American was recovering from its previous financial difficulties. Remco was incorporated in 1950 under the laws of the State of New Jersey and had its principal office and manufacturing operations on Cape May Street, Harrison, New Jersey. American had its operating facilities in Wilkes-Barre, Pennsylvania. The Harrison, New Jersey facility ("Harrison facility") used by Remco was approximately seven or eight years old in 1972 and contained about 600,000 square feet of which it used only one-half. The Wilkes-Barre, Pennsylvania facility used by American was 95 years old. One of the factors which petitioner considered when purchasing the stock of Remco was the potential use of the Harrison facility by petitioner and its affiliates. By October of 1972 some of the operations had been moved to the Harrison facility. Both Remco and American manufactured children's toys. American's main product lines included swing sets, hobby horses, pre-school age desks and blackboards. Sales of these types of toys are not highly seasonal. Remco's product lines included activity toys, dolls and doll accessories, craft sets, and pre-school toys. Sales of these types of toys are seasonal. Because *581 *6 Remco's product lines were seasonal and American's product lines were not highly seasonal, Gurbst as president of American felt that it would be advantageous to both companies to combine their operations in one facility in order to reduce overhead and assist Remco in developing a year round operation. Remco introduced its product line for the year at the Toy Fair held in February of each year. From the response of buyers at the Toy Fair in February of 1973, it was predicted that Remco would have gross sales for 1973 of at least $22,000,000 and that net sales for 1973 would be approximately $19,000,000. Most of the orders for these products would be placed during the first six months of the year. The toys were to be manufactured from the beginning of March through October or the middle of November. It was anticipated that $15,000,000 of the net sales would be shipped from June through December of 1973. Payment for these shipments would be made from December of 1973 through February of 1974. Subsequent to petitioner's acquisition of Remco, the members of Remco's board of directors and key management personnel resigned. These positions were filled by personnel affiliated with petitioner. *582 Prior to its acquisition by petitioner, Remco had experienced financial reverses. During the two years immediately preceding its acquisition by petitioner, Remco had sustained substantial losses from continuing operations. On January 21, *7 1971, Remco filed a petition for an arrangement under chapter XI of the Bankruptcy Act. An Order confirming Remco's plan of arrangement was issued on April 28, 1971. Under the plan of arrangment Bankers Trust Company ("Bankers") was to advance $7,500,000 to Remco. Remco's obligation to repay this sum was to be secured by a first mortgage in the amount of $7,500,000 on Remco's real estate and a security interest in all inventory owned or acquired by Remco. Pursuant to an agreement dated April 23, 1971, Remco was to use the amount borrowed from Bankers to pay existing indebtedness to Bankers of approximately $6,000,000 and to use the excess proceeds to pay the balance due to The Mutual Life Insurance Company. The plan of arrangement also provided that James Talcott, Inc. ("Talcott") would advance funds to Remco to be secured by security interests in accounts receivable, goods and chattels, inventory, warehouse receipts, and general intangibles. *583 Talcott was also given a third mortgage on certain real estate owned by Remco. In addition Remco assigned any claim for a Federal income tax refund for years 1968 and 1969 to Talcott. Initially, the amount of the advance made by Talcott to Remco was $2,900,000 with an agreement to advance additional sums to Remco based on 75 percent of Remco's eligible receivables. This agreement was modified by letter agreement dated May 11, 1972, which provided that Talcott in its discretion, would lend up to $11,000,000 on a *8 borrowing base of 75 percent of eligible receivables and an additional $1,000,000 on a borrowing base of 50 percent of inventory value. Finally, the plan of arrangement provided that Remco would execute a second mortgage on its real estate and provide a subordinated security interest on its machinery, equipment and inventory to William N. Otte, ("Otte"), Secretary to the Creditors Committee of Remco, who represented the former unsecured, general creditors of Remco. These interests were to secure deferred, installment payments due in the amount of $1,186,420. The plan of arrangement specifically provided for repayment of the Bankers and Talcott loans. Remco was to make *584 quarterly payments of principal to Bankers in the amount of $93,750 from August 1, 1971, through May 1, 1976, when a final installment in the amount of the unpaid balance of principal and accrued interest was to be made. Remco was also required to make quarterly payments of interest to Bankers. Other payments to Talcott and Bankers were to be made from collections on accounts receivable arising prior to January 21, 1971. In addition Remco was required to pay Bankers a percentage of after-tax, net income over the amount of $1,000,000. Finally, Otte was to be paid the following amounts: *9 January 15, 1972
$50,000
April 26, 1972
284,089
October 26, 1972
284,111
April 26, 1973
284,110
October 26, 1973
284,110
$1,186,420
The Financing Agreement executed by Talcott and Remco provided, in pertinent part: 2. * * * You [Talcott] or your designee may notify customers or account debtors at any time that Receivables have been assigned to you or of your security interest therein, collect them directly and charge the collection costs and expenses to our account but, unless and until you do so or give us other instructions, we shall make collection of all Receivables for you, receive all payments thereon *585 as your trustee and immediately deliver them to you in their original form.* * * 6. * * * We [Remco] appoint you [Talcott], your nominee or any other person whom you may designate as our attorney, with power: to endorse our name on any checks, notes, acceptances, money orders, drafts or other forms of payment of security that may come into your possession; to sign our name on any invoice or bill or lading relating to any Receivables, on drafts against customers, on schedules and assignments of Receivables, on notices of assignment, financing statements and other public records, * * * to notify the post office authorities to change the address for delivery of our mail to an address designated by you; to receive, open and dispose of all mail addressed to us; * * * This power, being coupled with an interest, is irrevocable so long as any Receivables assigned to you or in which you have a security interest remain unpaid or until the Obligations have been fully satisfied. * * * *10 The Financing Agreement with Talcott provided that any loans made pursuant to the agreement or any supplement thereto would be payable on demand. At the end of Remco's 1971 calendar year, Remco's balance sheet *586 disclosed an excess of current assets over current liabilities of $1,106,263 but an excess of total liabilities over total assets of $3,046,072. [4] Remco's statement of operations for 1971 reported a loss from continuing operations in the amount of $4,443,483. During 1972 Remco continued to experience financial problems. In the purchase agreement executed by petitioner and the majority shareholders of Remco, Remco's financial condition was described as follows: Through December 31, 1971, the Corporation had substantial losses from operations which impaired capital. Substantial additional losses from operations have been incurred since December 31, 1971 resulting in a further impairment of capital. The future of the Corporation as an operating business will depend upon its ability to operate profitably and the availability of such financing as may be required. At the end of Remco's 1972 calendar year, Remco's balance sheet disclosed an excess of current liabilities over current assets in the amount of $2,698,762 *587 and an excess of total *11 liabilities over total assets in the amount of $5,925,175. [5] Remco's statement of operations for 1972 reported a loss from continuing operations in the amount of $3,274,155. [6] Assuming the sale of the Harrison facility Remco had total debts in the amount of $8,794,372 and total equity in the amount of $28,063. [7]
*588 In 1973 Remco prepared projections of monthly income or loss from operations and balance sheet amounts. [8] Each projected amount was compared to actual opertions at the end of the month. The projections indicated that Remco would have a total pre-tax net income of $550,000 for 1973. In addition a cash availability analysis was prepared which indicated that cash receipts would exceed cash disbursements, after repayment of current loan *12 obligationd to Talcott and Otte, by a total of $305,000 for 1973. The cash availability analysis was based on the assumption that the Harrison facility owned by Remco had been disposed of at the beginning of 1973 resulting in the elimination of the liability to Bankers. The cash availability analysis also assumed that cash receipts would include further loans from Talcott based on 75 percent of Remco's receivables and advances from petitioner or its related entities in the amount of $2,050,000. The projections were reviewed by the management of petitioner. In 1972 early 1973 Remco reached agreements *589 with Bankers, Otte, and Talcott which permitted Remco to defer payments due to each respective creditor. By letter agreement dated May 10, 1972, Bankers permitted Remco to pay the amount of $251,544.38 due on May 1, 1972, for Remco's $7,500,000 obligation to Bankers in monthly installments of $10,000 through December 29, 1972, when the balance of the amount due together with interest was to be paid. Subsequently the record indicates that Bankers agreed to an extension of time for the payment of approximately $360,000 of interest due for the period ending December 31, 1972. The agreement with Otte permitted Remco to defer its final three payments of approximately $283,500 each due on October 26, 1972, April 26, 1973, and October 26, 1973, under the plan of arrangement to January 26, 1973, April 26, 1974, and October 26, 1974, respectively. The letter agreement with Talcott dated May 11, 1972, permitted Remco to pay the $400,000 *13 promissory note due on May 1, 1972, in monthly installments of $50,000 commencing on October 1, 1972, with the balance payable at December 31, 1972. Beginning on November 3, 1972, petitioner made unsecured cash advances to Remco. The amounts and dates of *590 these advances were: Date of Advance
Amount of Advance
November 3, 1972
$175,000
January 12, 1973
90,000
January 19, 1973
50,000
January 22, 1973
70,000
January 26, 1973
410,000
February 2, 1973
400,000
February 5, 1973
75,000
February 6, 1973
75,000
February 7, 1973
75,000
February 9, 1973
55,000
February 10, 1973
100,000
February 16, 1973
100,000
February 20, 1973
60,000
February 21, 1973
50,000
February 23, 1973
115,000
March 3, 1973
100,000
March 5, 1973
185,000
March 9, 1973
150,000
March 12, 1973
50,000
March 16, 1973
100,000
March 19, 1973
60,000
March 24, 1973
50,000
March 30, 1973
65,000
April 6, 1973
100,000
April 13, 1973
25,000
April 16, 1973
50,000
April 19, 1973
50,000
April 27, 1973
25,000
May 1, 1973
85,000
May 7, 1973
50,000
May 8, 1973
40,000
May 21, 1973
75,000
June 22, 1973
100,000
July 2, 1973
75,000
July 5, 1973
50,000
July 6, 1973
75,000
July 17, 1973
50,000
July 18, 1973
50,000
August 8, 1973
50,000
September 7, 1973
10,000
October 15, 1973
75,000
Total
$3,420,000
*14 The advances were made to provide working capital needed for Remco's operations and were made at the request of Edmund Rossi who was controller and subsequently general manager of Remco based on his determinations of the cash needs of Remco. The adavnces were then approved by Jack *591 Falcon, vice-president of finance of petitioner, or Leonard Roth ("Roth"), chairman of the board of petitioner. Included in the above enumerated advances is the amount of $587,850 which represents advances made to Remco on behalf of Roth Properties, Inc. ("Properties"), an affiliate of petitioner. With the exception of the advance made on September 7, 1973, all of the advances made by petitioner to Remco were recorded on petitioner's General Ledger as receivables from Remco.These amounts were recorded on Remco's books as payables. Remco repaid the $10,000 advance made on September 7, 1973, on September 10, 1973. Properties, in effect, assumed the liability for payment of advances in the amount of $587,850 as part of the purchase price for Remco's Harrison facility. No other amounts due to petitioner from Remco were paid or assumed by another party. *15 No interest was paid on any of these advances. However, Remco reflected accrued interest expense on its accounting records, and petitioner recorded "Interest Income--Remco" and "Interest Receivable--Remco" on its General Ledger. Petitioner reported interest income from Remco on its Forms 1120, U.S. Corporation Income Tax Returns, for *592 the years ending April 30, 1973, and April 30, 1974. [9]
The advances were not evidenced by notes or other instruments of indebtedness. However, one resolution of petitioner's board of directors authorized loans to Remco, and resolutions of Remco's board of directors approved receipt of advancements from petitioner in the aggregate amount of $2,997,150. The resolutions of Remco's board of directors directed its officers to execute notes evidencing the indebtedness. Only the resolution of November 3, 1972, by Remco's board of directors, approving receipts in the amount of $175,000, stated the period of the advance or the rate of interest payable. This resolution also provided, in pertinent *593 part, that: [T]he Directors deem it to be in the best interests of [Remco] to effect such borrowing from [petitioner], which borrowing can be made on terms and at a rate of interest *16 substantially more favorable and beneficial to [Remco] than are obtainable elsewhere. Petitioner's source of funds for the adavnces to Remco were its own capital sources, including loans from Society National Bank and Talcott. Society National Bank had financed the initial advance to Remco in the amount of $175,000 but had been unwilling to finance subsequent advances. Pursuant to a loan agreement between Talcott, petitioner, Roth Steel Products Company, Toledo, American, and Roshel, effective as of January 24, 1973, Talcott agreed to make loans to petitioner and the other signatory corporations. The Talcott loans were secured by accounts receivable, inventory, equipment, real estate, guaranties and other collateral.The loan agreement required, in part, that petitioner and the other signatory corporations advance $1,650,000 to Remco. These advances were to be evidenced by appropriate documentation, copies of which would be furnished to Talcott. Petitioner's president was authorized to execute such *594 documentation. The loan agreement did not prohibit the lending corporation from perfecting a security interest in Remco's assets, although a prior agreement between Remco and Talcott would require that Talcott consent to the creation of such a security interest. Talcott also continued to make loans directly to Remco. In addition the terms of the loan agreement required the sale of Remco's Harrison facility to Properties. Properties and Remco executed an agreement for the sale of the real estate on *17 May 16, 1973. The purchase price of $7,500,000 was to be paid by Properties' assumption of the unpaid balance on the first mortgage held by Bankers and by assumption of liability for advances made by petitioner to Remco in the amount of $587,850. On the same date as the sale of the real estate, Properties and Remco executed a lease agreement which provided that Remco would lease the real estate it had sold to Properties for a term of ten years commencing on January 1, 1983. The rental for this property was $83,333.33 per month. Remco was to pay all real estate taxes and utilities related to the property, purchase and pay for insurance for the property, and repair and maintain the property. *595 Despite the new management and infusion of additional funds, Remco continued to experience financial difficulties through 1973. For the periods ending February 4, 1973, and March 4, 1973, the actual results of operations were more favorable than projected. However, actual results of operations were less favorable than projected for the period ending April 1, 1973, through the period ending December 2, 1973. These variances were due, in part, to a lower volume of net sales billed than anticipated. Net sales actually billed as compared to the projected figures for these periods were: *18 Net Sales
Projected Net
Period Ended
Actually Billed
Sales Billed [10]
Variance
4/1/73
$717,000
$785,000
$68,000
5/6/73
$895,000
$960,000
$65,000
6/3/73
$856,000
$1,290,000
$434,000
7/1/73
$1,345,000
$1,790,000
$445,000
8/5/73
$1,236,000
$1,785,000
$549,000
9/2/73
$1,914,000
$2,530,000
$616,000
9/30/73
$1,983,000
$3,460,000
$1,477,000
11/2/73
$2,706,000
$4,125,000
$1,419,000
12/2/73
$1,529,000
$2,230,000
$701,000
At the end of 1973 Talcott indicated that it would make no further loans *596 to Remco, and Remco determined operations should be discontinued because of lack of working capital for the succeeding season. Remco ceased operations in January of 1974, and its assets were turned over to Talcott. Petitioner claims that as a result of the discontinuance of Remco's operations it is entitled to ordinary deductions in the aggregate amount of $3,426,876 representing the cost of acquisition of Remco's shares in the amount of $553,062 and advances to Remco in the amount of $2,873,814. Respondent maintains that the total amount claimed as an ordinary deduction by petitioner is an investment loss which is characterized as a capital loss. As petitioner had no gains from the sale or exchange of capital assets during the periods at issue, such a capital loss would not be available to reduce petitioner's taxable income for these periods. *19 OPINION As a preliminary matter we must consider the admissability of Exhibit 59, "Request for Credit Line" and "Remco Industries, Inc. Credit Line Comments." Attached to the documents is the affidavit of Vito J. Ascatigno, assistant vice president of Talcott from June of 1962 to February of 1974. In the affidavit Mr. Ascatigno avers that *597 he had personal knowledge of both documents. Petitioner claims that it offers this exhibit merely to demonstrate that Talcott made an investigation into Remco's financial status in May of 1973, not to demonstrate that the information contained therein was correct. In the alternative petitioner claims that the exhibit is admissable as a business record. Respondent contends that the use of the document to prove that an investigation was conducted by Talcott renders the document inadmissable as hearsay, not subject to any of the exceptions to the general rule of exclusion. The Federal Rules of Evidence apply to trials conducted in this Court. Sec. 7453; Rule 143(a). Under the Federal Rules of Evidence, hearsay is defined as "a statement * * * offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Hearsay generally is inadmissable. Fed. R. Evid. 802 . However, there are several exceptions to the general rule *20 of inadmissability. Included among these exceptions is Fed. R. Evid. 803(6) which describes, in pertinent part, those documents subject to the exception as: A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, *598 opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, allasshownbythetestimonyofthecustodianorotherqualifiedwitness, * * * [Emphasis Added] In this instance the documents contained in Exhibit 59 are not offered to prove the truth of the matters asserted therein but merely to show that an investigation was undertaken by Talcott. For this limited purpose the documents are not hearsay within the definition of Fed. R. Evid. 801(c). However, the statements contained in the document are hearsay within the definition of Fed. R. Evid. 801(c). These statements are not admissable to prove the truth of the matters asserted therein under the exception contained in Fed. R. Evid. 803(6) as neither the custodian nor any other qualified witness testified at the trial of the case. The affidavit submitted with the documents is not sufficient to satisfy this requirement as our rules clearly state that an ex parte affidavit is not evidence. *599 Rule 143(b). We must next consider petitioner's claim that the amounts expended to acquire Remco's stock are deductible as an ordinary loss under section 165(a) for its taxable year ending April 30, *21 1974. Respondent maintains that this loss is a capital loss, allowable only to the extent of capital gains under section 1211(a). Resolution of this issue depends on whether the Remco stock was a capital asset in the hands of petitioner. Section 1221 defines capital assets as "property held by the taxpayer (whether or not connected with his trade or business)." Five types of property are specifically excluded from the definition of capital assets. Sec. 1221(1)-(5). It is clear that the Remco stock owned by petitioner does not fall within any of the five exceptions. The exceptions to the definition of capital assets enumerated in section 1221 are not exclusive, and a further exception has been judicially recognized. Corn Products Refining Co. v. Commissioner,350 U.S. 46 (1955). See also Foy v. Commissioner, 84 T.C.     (filed Jan. 14, 1985). Under this judicially recognized exception "profits and losses arising from the everyday operation of a business [are] considered as ordinary *600 income or loss rather than capital gain or loss." Corn Products Refining Co. v. Commissioner,supra at 52. In Corn Products the taxpayer acquired corn futures to insure an adequate supply of raw corn at a price that would permit its finished products to compete successfully in the market. The Supreme Court upheld the findings of this Court and the Court of Appeals for the Second *22 Circuit that, in such circumstances, the corn futures were not capital assets in the hands of the taxpayer as they were an integral part of the taxpayer's manufacturing business. This Court and others have applied the rule enunciated in Corn Products in situations involving the purchase of stock of another corporation. W.W. Windle Co. v. Commissioner,65 T.C. 694, 707-708 (1976) and cases cited therein. [11] In W.W. Windle Co. we concluded that such stock could be a capital asset even in a "mixed" motive situation and held that "where a substantial investment motive exists in a predominantly business-motivated acquisition of corporate stock, such stock is a capital asset." W.W. Windle Co. v. Commissioner,supra at 713. The substantial investment motive may exist at the time of acquisition of the stock or *601 during the period the stock is retained. Arkansas Best Corp. v. Commissioner,83 T.C. 640, 653-654 (1984). [12]
Petitioner claims that the Remco stock was purchased in order to assist it in increasing its East coast sales, to reduce the overhead of petitioner and its affiliates, and to facilitate American's operations. Petitioner argues that the factual circumstances involved herein are similar to those in John J. *23 216 F. Supp. 928 (N.D. Ill. 1963), affd. 328 F.2d 163 (7th Cir. 1964), where the court held that a loss on the sale of the stock of the subsidiary corporation was an ordinary loss. Petitioner also argues that it had a business motive within the definition adopted by Datamation Services, Inc. v. Commissioner,T.C. Memo. 1976-252. Consequently, petitioner maintains that it is entitled to an ordinary loss on its Remco stock at the time that Remco ceased *602 operations. For the reasons discussed below, we do not agree. Initially we note that many of the reasons cited by petitioner for its acquisition of the Remco stock relate to the business of its subsidiaries. Gurbst testified that he had urged petitioner to acquire Remco in order to combine the operations of Remco and American at the Harrison facility. Gurbst also testified that this would enhance operations of both corporations by reducing combined overhead and permitting year-round operations. Further Gurbst testified that the operations of petitioner and its other affiliates would be benefitted by the availability of the Harrison facility. Gurbst's testimony was *24 corroborated by the testimony of Roth. [13] *603 The testimony of Gurbst and Roth indicate that the stock acquisition was primarily intended to be, in effect, an investment in petitioner's operating subsidiaries. Consequently, we cannot find that the Remco stock was acquired or retained primarily to benefit petitioner's own business operation. Further, even had petitioner demonstrated that the acquisition and retention of the Remco stock was predominantly motivated to benefit its own business operations, the record also amply supports the conclusion that petitioner had a substantial investment purpose when it acquired and retained the Remco stock. Gurbst and Roth testified that petitioner anticipated that Remco could continue its operations through commerical loans and its sales. Gurbst also testified that Remco had at least one significant product at the time of petitioner's acquisition which was projected to generate five or six million dollars in sales. In addition Gurbst testified that he anticipated that a new product would be introduced through Remco which would generate additional sales. Finally, Gurbst testified that petitioner planned to reduce overhead and improve operations by infusing new *25 management into Remco. Implementation of these plans, in the opinion *604 of Gurbst, would permit Remco to become an independent operating entity. This contemplated financial recovery under new management was consistent with petitioner's experience with American which by 1972 had significantly reduced losses as reported on its Forms 1120, U.S. Corporation Income Tax Returns. All of the above factors indicate that petitioner viewed its acquisition and retention of the Remco stock as an advantageous investment in a company which, with proper management, could become profitable. We can only conclude from this record that petitioner had a substantial investment motive when it acquired and retained the Remco stock. A substantial investment motive at the time of acquisition or retention of the stock requires treatment as a capital asset. Arkansas Best Corp. v. Commissioner,supra;W.W. Windle Co. v. Commissioner,supra at 712-714. As the Remco stock was a capital asset, the loss on this asset would be a capital loss, allowable only to the extent of capital gains under section 1211(a). Petitioner reported no capital gains for its taxable year ending April 30, 1974. Consequently, we must sustain respondent's determination that no loss attributable to petitioner's *605 investment in the Remco stock is allowable for its taxable year ending April 30, 1974. *26 We must next consider petitioner's claim that it is entitled to an ordinary deduction for its taxable year ending April 30, 1974, for a bad debt loss on the advances made to Remco in the amount of $2,873,814. [14] Petitioner asserts that these amounts represent bona fide indebtedness. Respondent maintains that these amounts were a contribution to capital and that any loss should be characterized as a capital loss, allowable only to the extent of capital gains under section 1211(a). There is no one characteristic which is decisive in the determination of whether funds advanced to a corporation are capital contributions or debt. John Kelley Co. v. Commissioner,326 U.S. 521, 530 (1946). Characterization *606 of such funds as capital contributions or debt must be answered by reference to all the evidence. Dixie Dairies Corp. v. Commissioner,74 T.C. 476, 493 (1980). The usual presumption of the correctness of respondent's determinations applies in making the determination as to the nature of the advances. Gooding Amusement Co. v. Commissioner,23 T.C. 408, 421 (1954), affd. 236 F.2d 159 (6th Cir. 1956). *27 In resolving the issue of whether such advanced funds are a capital contribution or debt, this Court and others have considered a myriad of factors. Dixie Dairies Corp. v. Commissioner,supra at 493. Among the factors considered are: (1) the manner of reporting the advances on the books of the parties involved; Byerlite Corp. v. Williams,286 F.2d 285, 290 (6th Cir. 1960); Litton Business Systems, Inc. v. Commissioner,61 T.C. 367, 378 (1973); (2) the identity of interest between the transferor of funds and stockholder; Fin Hay Realty Co. v. United States,398 F.2d 694, 696 (3d Cir. 1968); Smith v. Commissioner,370 F.2d 178, 180 (6th Cir. 1966); (3) use of the amounts received; Estate of Mixon v. United States464 F.2d 394, 402 (5th Cir. 1972); Wood Preserving Corp. of Baltimore v. United States,347 F.2d 117, 120 (4th Cir. 1965); *607 (4) the length of the transaction; Byerlite v. Williams,supra at 291; (5) actual repayment of the advances comporting with the terms of the transaction; Mixon v. United States,supra at 402, Gooding Amusement Co. v. Commissioner,supra at 419; (6) the ratio of debt to equity; J.S. Biritz Construction Co. v. Commissioner,387 F.2d 451, 459 (8th Cir. 1967); Post Corp. v. United States,640 F.2d 1296, 1307 (Ct. Cl. 1981); (7) security provided for the repayment of the advances; A.R. Lantz Co. v. United States,424 F.2d 1330, 1334 (9th Cir. 1970); Wood Preserving Corp. of Baltimore v. United States,supra at 119; (8) the recipient's ability to repay the advances; C.M. Gooch Lumber Sales Co. v. *28 49 T.C. 649, 657-658 (1968); (9) the recipient's ability to obtain financing from an independent lender; Smith v. Commissioner,supra at 180; Georgia-Pacific Corp. v. Commissioner,63 T.C. 790, 797-798 (1975); (10) provisions for interest; Dixie Dairies Corp. v. Commissioner,supra at 494-495; (11) subordination of the right to repayment to other debts of the recipient; Charter Wire, Inc. v. United States,309 F.2d 878, 880 (7th Cir. 1962); Litton Business Systems, Inc. v. Commissioner,supra at 378; *608 (12) execution of an instrument of indebtedness; Matter of Uneco, Inc.,532 F.2d 1204, 1210 (8th Cir. 1976); Post Corp. v. United States,supra at 1304; and (13) a pattern of repeated shareholder advances, as opposed to a single outlay; Green Bay Structural Steel, Inc. v. Commissioner,53 T.C. 451, 458 (1969). The enumerated factors are only an aid to resolving the question of whether an advance constitutes indebtedness for Federal income tax purposes. Dixie Dairies Corp. v. Commissioner,supra at 494. The ultimate question is "[w]as there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?" Litton Business Systems, Inc. v. Commissioner,supra at 377. "In all cases, the prevailing consideration is that artiface must not be exalted over reality." Byerlite Corp. v. Williams,supra at 291. *29 On the basis of the record before us, we conclude that the advances made to Remco by petitioner were capital contributions rather than debt. Byerlite Corp. v. Williams,supra, cited by petitioner in support of its position that the advances were debt is distinguishable *609 on its facts. In Byerlite Corp. v. Williams, the taxpayer made advances to a subsidiary corporation which operated at a substantial loss during each year of its existence. However, the Court sustained the taxpayer's characterization of the advances as loans finding that: Nothing could be more unreal, as we look at the whole operation, than to draw the conclusion that Byerlite's [taxpayer] advances were intended as investments in Export's capital stock. The risk of loss which was assumed by Byerlite was not assumed so that it could enjoy the chances of Export's profits; that risk was taken in carrying on its business in the procurement and sale of asphaltic materials. * * * [Byerlite Corp. v. Williams,supra at 293.] In the instant case we have determined that petitioner acquired and retained Remco stock for the purpose of investment, not as ancillary to its business of manufacturing and selling steel products. Consequently, we find that petitioner's position cannot be sustained on the basis of the analysis in Byerlite Corp. v. Williams
Other factors lead us to the conclusion that the situation in Byerlite Corp. v. Williams is inapposite to the circumstances in the instant case. *610 The Sixth Circuit in Byerlite specifically found that the transaction was not directed to the subscription of a small investment in the capital stock of the subsidiary when a large investment was required for operations and that the *30 transaction did not supply capital investment which was needed without requiring or expecting repayment. Byerlite Corp. v. Williams supra at 292. Here, we believe that Remco was seriously undercapitalized and that a substantial and committed capital base was an inherent condition and requirement of obtaining third party financing. In effect, the advances by petitioner to Remco provided an additional equity cushion for third party loans by Talcott. In addition the subsidiary in Byerlite Corp. v. Williams was merely a protective shell which was organized solely to remove and transport asphaltic materials which would subsequently be shipped and sold by taxpayer. Byerlite Corp. v. Williams,supra at 288. The subsidiary was a captive corporation, and its ability to repay the loans was controlled by the taxpayer. Unlike the situation in Byerlite Corp. v. Williams, Remco was a separate entity engaged in its own business enterprise, and it could only repay *611 the advances from petitioner as well as obligations to third party lenders through its own profitable operations. While we do not substitute our judgment for the business judgment of petitioner's officers and directors, our focus is on the true nature of the financial arrangements between petitioner and Remco. In making our determination as to the characterization of the advances made to Remco by petitioner, we *31 have considered the factors enumerated by this Court and others. Those factors, as material to the determination in the instant case, are discussed below. Several factors provide support for petitioner's position that the advances were bona fide indebtedness. First, both petitioner and Remco reported substantially all of the advances as loans on their accounting records. In addition both entities reflected interest attributable to these advances on their accounting records, and petitioner reported accrued but unpaid interest income on its Federal income tax returns for taxable years ending April 30, 1973, and April 30, 1974. Second, 38 percent of the Remco stock was owned by shareholders other than petitioner. These shareholders did not make proportionate advances to *612 Remco. Third, the amounts advanced were not used for acquisition of capital assets but were used for working capital needed for Remco's day-to-day operations. Fourth, the advances were characterized as debt in resolutions of Remco's board of directors. We believe these resolutions were merely "window dressing" and note that most of the advances were ratified after the fact. These factors, however, are not sufficient to overcome the overwhelming weight of the evidence which leads us to the conclusion that the advances were capital contributions to Remco. Initially, we must consider the fact that Remco was never a profitable entity at any time that petitioner owned the Remco *32 shares and that it had, in fact, experienced losses in the two years immediately preceding petitioner's acquisition of the Remco stock. In addition in 1972 and early 1973 Remco had reached agreements with three of its creditors to defer payments due to these creditors. Gurbst and Roth testified that petitioner was optimistic regarding Remco's potential for recovery. Remco's projections of financial operations for the 1973 year reflected this optimism. However, Remco's financial success for 1973 was dependent *613 on the sales that it generated in the first six months of the year, and in particular on the sales which were generated after the Toy Fair held in February of 1973. Petitioner maintains that Remco had a positive response to the products it introduced at the Toy Fair. However, the volume of sales actually made compared to the projected amounts for the periods succeeding the Toy Fair were lower than anticipated. Although the unfavorable variances for the periods ending April 1, 1973, and May 6, 1973, were negligible compared to the total volume of sales projected, for the period ending June 3, 1973, through the period ending December 2, 1973, the volume of sales actually made was significantly smaller than projected sales. *33 The repayment of the advances made by petitioner was dependent on the prospective financial success of Remco. Roth testified that it was anticipated that Remco would repay the advances through availability from borrowing. [15] Remco's ability to borrow was dependent in large part on the sales that it made. It is obvious that immediate repayment would not be available from Remco's existing assets as virtually all of Remco's assets were subject to security interests. *614 The obligations secured by the assets were in excess of the book value of the assets as of December 31, 1972. It is clear from this record that petitioner could not have had a reasonable expectation of repayment at any time during which the advances were made. Remco had sustained losses in the two years preceding its acquisition by petitioner. There was no assurance that the changes made in Remco's managment or the introduction of a new product line would make Remco a successful operation. Petitioner could reasonable evaluate Remco's prospects for success only after the first six months of 1973 during which orders were received for the Remco products. By the end of the six month period, Remco's financial condition had already deteriorated indicating that the projections had been unrealistic *34 and Remco would not have a profitable year. *615 The record here shows that petitioner gambled that Remco's operations would be successful. Advances made under these circumstances simply are not bona fide indebtedness. [16] *616 Petitioner argues that the fact that Talcott continued to make loans to Remco during this period indicates that petitioner's expectation of repayment was reasonable. We cannot agree with this assertion. At least one commercial lender had declined to loan funds to petitioner for Remco's use. The Talcott loans were secured by Remco's assets which had a book value in excess of the amounts loaned by Talcott. In addition Talcott made most of its advances to Remco on the basis of its receivables and inventory value. Talcott was specifically *35 authorized to collect such receivables and was given a power of attorney which would enable it to negotiate any payment made to Remco. Finally, the obligations were payable on demand. Considering these factors it is clear that Talcott could quickly recover a substantial portion of *617 the amounts advanced at any time irrespective of Remco's financial condition. Talcott did, in fact, have a reasonable expectation of repayment. Unlike Talcott, petitioner did not have any security for its advances, nor did it have the right to collect or negotiate payments made to Remco. In effect petitioner's right to repayment was subordinated to the interests of Bankers, Talcott, and Otte. At best petitioner would share in the proceeds which remained after obligations to secured creditors were satisfied. We cannot find, under these circumstances, that the fact that a fully secured outside lender would loan substantial sums to Remco indicates that petitioner had a reasonable expectation of repayment when it made advances to Remco. In addition the resolution of Remco's board of directors which authorized receipt of advances in the amount of $175,000 from petitioner specifically stated that receipt of advances from petitioner was advantageous as the terms offered were more favorable than available through other sources of financing. Other evidence in the record supports our conclusion that petitioner's advances to Remco were contributions to capital and not debt. Remco did not *618 make repayments in accordance with the *36 terms of the advances. The resolution of Remco's board of directors dated November 3, 1972, indicated that the advance in the amount of $175,000 made to Remco was to be repaid within 60 days of the date of the advance, which would require that the advance be repaid on or before January 2, 1973. This advance was not repaid. This alone is a strong indication that a true debtor-creditor relationship was not contemplated by the parties. Although petitioner maintains that advances in the amount of $587,850 were repaid, petitioner characterized this as amounts advanced for the benefit of Properties and transferred the receivable from the Remco account to the Properties account at the date when the Harrison facility was purchased by Properties. This was not a repayment, but an adjustment of accounts through bookkeeping entries in which funds were neither remitted nor applied. Apparently, the only amount which was repaid was $10,000 which was advanced on September 7, 1973, and repaid on September 10, 1973. In addition the loan agreement executed by Talcott, petitioner, Roth Steel Products Company, Toledo, American, and Roshel required that the signatory *619 corporations advance $1,650,000 to Remco. This indicates that Talcott desired an infusion of funds into Remco subordinate to its loans. Talcott was not concerned whether this infusion was characterized as debt or equity except to the extent that any interest or principal repayments might affect its security. We believe that Talcott as *37 a lender engaged in financial factoring wanted a working capital cushion to be provided by petitioner and the other signatory corporations for this security. This infers a capital, and not a loan, transaction. We also note that the loan agreement required that the advances to Remco from petitioner and the other signatory corporations be evidenced by appropriate documentation, that the resolution of petitioner's board of directors authorized its president to execute such documentation, and that the resolutions of Remco's board of directors directed its officers to execute notes to evidence receipt of the advances from petitioner. Petitioner concedes that no notes or other documentation were executed. We understand that the demands of business exigencies often require corporate executives to act with dispatch. Nevertheless, when a loan agreement *620 requires certain documentation and the directors of a corporation authorize or direct their officers to execute such documentation, it is questionable whether a true loan was intended when no documentation is executed. In addition, here, petitioner made no attempt to receive any subordinated security interest for its advances to Remco although this was not prohibited by the loan agreement with Talcott. These actions address petitioner's intent more clearly than self serving statements that the advances were intended to be debt. These actions do not support petitioner's expressed intention. *38 Remco was highly leveraged. Assuming that the Harrison facility was sold, Remco's debt to equity ratio at December 31, 1972, was in excess of 300 to 1. [17] It is reasonable to infer under these circumstances that any advances made by petitioner were necessary to provide additional capital to supplement Remco's inadequate capital structure. Finally, we note that there was a repeated pattern of shareholder advances. Petitioner made 42 advances to Remco over *621 a one year period. These advances were required to maintain Remco's operation and suggest that a contribution to capital rather than a loan was made. It is apparent that from the inception petitioner desired to leverage an entrepreneurial risk by cosmetically transforming a venture capital investment transaction into a creditor arrangement. But the substance of the arrangement belies its poorly structured facade. Petitioner's failure to document properly its advances to Remco with executed instruments indicates its own understanding that the advances were never intended to be bona fida indebtedness. As we have determined that petitioner's advances were contributions to capital rather than bona fide indebtedness, petitioner may not deduct its loss on the advances under section 166(a). The advances were an additional investment in Remco.As *39 discussed supra, petitioner's investment in Remco was a capital asset. Any loss on these advances would be a capital loss, allowable only to the extent of capital gains. Sec. 1211(a). Petitioner reported no capital gains for its taxable year ending April 30, 1974. Consequently, we must sustain respondent's determination that no loss attributable *622 to petitioner's advances to Remco is allowable for its taxable year ending April 30, 1974. Finally, we must consider the issue of whether petitioner is entitled to a net operating loss deduction for the taxable years ending April 30, 1971, April 30, 1972, April 30, 1973, June 30, 1974, and June 30, 1975. Having determined that respondent properly characterized petitioner's loss on its Remco stock and the advances made to Remco as capital rather than ordinary, we must likewise sustain respondent's determination that petitioner is not entitled to a net operating loss for these periods. Further, a capital loss will not effect petitioner's income for these periods. Section 1211(a) provides for an allowance of capital losses only to the extent of capital gains. Any unused net capital loss may be carried back for three years and carried forward for five years and shall be treated as a short-term capital loss in each such year. Sec. 1212(a). The capital loss carried back or carried forward may only be utilized to the extent of capital gains. Sec. 1211(a). Here, petitioner had no capital gains for any of these taxable years. Consequently, we must sustain respondent's determination that *623 petitioner's taxable *40 income for these periods is not reduced by losses attributable to petitioner's investment in Remco or its subsequent advances to Remco. In accordance with the foregoing, Decision will be entered for the respondent.
Footnotes
1. In its petition petitioner claimed that it had properly made additions to its reserve for bad debts in each of its taxable years ending April 30, 1973, April 30, 1974, June 30, 1974, and June 30, 1975. The burden of proving that such additions are reasonable is on petitioner. Roth Steel Tube Co. v. Commissioner,68 T.C. 213, 218 (1977), affd. 620 F.2d 1176↩ (6th Cir. 1980). Petitioner neither introduced evidence to meet its burden of proof nor raised the issue of the reasonableness of the bad debt its position. Consequently, we assume that petitioner has conceded that the additions to its bad debt reserve are not deductible under sec. 166(c). In any event petitioner has introduced no evidence and has not met its burden of proof. 2. Unless otherwise specified, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years at issue, and all rule references are to the Tax Court Rules of Practice and Procedure. ↩
3. Respondent raises the issue of whether any deduction is allowable for the amount of $51,664 for the first time on brief. In his notice of deficiency respondent characterized this amount as a capital loss allowable to the extent of capital gains under sec. 1211(a). Petitioner responded to this issue on brief claiming that the record supports its contention that this amount is deductible as an ordinary loss. We decline to further consider this issue as neither party has presented any conclusive evidence in this respect.
4. This amount does not reflect any revaluation surplus created by appreciation in the real property owned by Remco, or any appreciation or depreciation in any other asset.↩
5. See Note 4. Pro-forma balance sheet amounts for 1972 were prepared reflecting the effect of the sale of the Harrison facility owned by Remco and the assumption of the Bankers mortgage by the purchaser. Using the pro-forma amounts, Remco's current assets exceeded current liabilities by $1,095,378 and total assets exceeded total liabilities by $28,063. ↩
6. Remco changed its method of computing depreciation from accelerated to straight-line for all assets other than real estate, effective January 1, 1972. This change resulted in a decrease in net loss for the year of approximately $34,900. In 1972 Remco also extended the period for amortization of costs of new product development, dies and molds from three years to five years resulting in a $202,576 decrease in net loss for 1972. ↩
7. Included in the total debt amount is an advance from petitioner of $175,000.↩
8. There is no indication as to when these projections were prepared. However, it is clear from the record that they were prepared after January 10, 1973.↩
9. Petitioner did not report the full amount of interest reflected as a receivable from Remco as interest income on its Forms 1120, U.S. Corporation Income Tax Returns, for the years ending April 30, 1973, and April 30, 1974. This discrepancy was explained by Norbert S. Bick, petitioner's accountant and auditor who testified that a portion of the amounts which normally would have been recorded as interest income were actually credited to interest expense, reducing the total interest expense amount.↩
10. For periods ending September 2, 1973, September 30, 1973, November 2, 1973, and December 2, 1973, projected net sales billed are pursuant to original projections.↩
11. See also Bell Fibre Products Corp. v. Commissioner,T.C. Memo. 1977-42↩. 12. In situations where stock is originally purchased for a business purpose and such business motive disappears leaving pure investment intent for continued retention, see W.W. Windle Co. v. Commissioner,65 T.C. 694, 714↩, n. 15 (1976).
13. We note that Roth's testimony was, in part, inconsistent with his prior statements. Roth testified that, to his knowledge, Properties was not actively pursuing acquisition of commercial properties. However, Roth signed a protest relating to Properties' taxable years ending in 1969 through 1972 which states, in pertinent part, "[p]rior to and during the years here at issue [Properties] actively pursued acquisition of new commercial realty."
14. This amount, in part, represents total advances in the amount of $3,420,000 less the repayment of $10,000 made by Remco on September 10, 1973, and the liability of $587,850 assumed by Properties. The remaining amount is attributable to $51,664 designated as accounts receivable from Remco. As discussed supra↩ at Note 3, we have declined to consider the deductibility of this amount as a separate issue.
15. Roth's contention would require us to find that capital contributions and infusion of capital are never a necessity and that working capital can always be generated from borrowed funds even though the corporation's working capital assets are totally devoured in the process leaving no room for repayment other than the financial factoring source.↩
16. It is unclear in this situation what information was available to petitioner at the time the advances were made. Roth testified that the advances were made after reviewing projections which indicated that Remco would have sufficient availability from borrowing to repay the advances. These projections were prepared or approved by Edmund Rossi, controller and subsequently general manager of Remco, and the record indicates that the projections were not available when the initial advances were made. Prior to the time the projections were available, Edmund Rossi prepared and submitted to petitioner estimates of receipts and disbursements of Remco. Edmund Rossi was also responsible for making requests for advances subject to the approval of Roth and Jack Falcon. We note that none of the witnesses at the trial of this case were able to provide specific details as to when the projections on which the advances were based were available or how Remco's cash needs were determined. In these circumstances, we believe that Edmund Rossi's testimony would be relevant to a determination of petitioner's knowledge of Remco's ability to repay the advances. When such a witness is not produced, the inference arises that any testimony given by that witness would not be favorable. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513↩ (10th Cir. 1947).
17. Petitioner has not shown that the fair market value of Remco's assets after the sale of the Harrison facility are in excess of book value.↩