T.C. Memo. 2005-32

UNITED STATES TAX COURT

INDMAR PRODUCTS CO., INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15428-03.               Filed February 23, 2005.

<u>Matthew P. Cavitch</u> and <u>Gerald P. Arnoult</u>, for petitioner.

<u>Kirk S. Chaberski</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

FOLEY, <u>Judge</u>:  By notice dated July 3, 2003, respondent determined deficiencies in, and penalties related to, petitioner's 1998, 1999, and 2000 Federal income taxes.  After concessions by respondent, the remaining issues for decision are whether:  (1) The cash transfers to petitioner were loans or capital investments; and (2) petitioner is liable for section

$6662^{1}$ penalties.

FINDINGS OF FACT

Indmar Products Company Inc. (petitioner), incorporated in 1971, is a marine engine manufacturer. In 1973, petitioner was owned equally by Richard Rowe, Sr. (Mr. Rowe), and Marty Hoffman. In 1978, Mr. Rowe became the majority stockholder owning 51 percent of petitioner's stock. After Mr. Hoffman died in 1985, Mr. Rowe and Donna Rowe (the Rowes) became the major stockholders each owning 37.22 percent of petitioner's stock. Other stockholders included Richard Rowe, Jr., and Diane Rowe (i.e., the Rowes' son and daughter-in-law) and Kathy and Joseph Tidwell (i.e., the Rowes' daughter and son-in-law).

From 1986 to 2000, petitioner's business grew significantly. Sales and costs-of-goods sold increased from $5 million and $3.9 million to $45 million and $37.7 million, respectively. In addition, petitioner's working capital (i.e., current assets minus current liabilities) increased from $471,386 to $3.8 million. Petitioner did not declare or pay formal dividends.

In 1987, the Rowes began transferring cash (transfers) to petitioner with the intent to take the money out as they needed it. After receiving advice from numerous estate planners, the

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Rowes wanted to characterize the transfers as loans because the Rowes believed that additional equity in petitioner would increase their estate tax burden and reduce the amount of property received by their heirs. The transfers were unsecured, undocumented, and petitioner agreed to pay a 10-percent return on all transfers from 1987 through 2000. During this 14-year period, the prime rate fluctuated between 6 and 9.5 percent for almost 12 years. Petitioner made monthly payments to the Rowes calculated at 10 percent of the transferred funds (i.e., reflected in the "notes payable - stockholders" account balance). The monthly payments represented an investment return and were not repayments of the transfers. Petitioner's partial repayments, however, were sporadic, paid on demand, based on the Rowes' financial needs, and not subject to set or predetermined due dates. From 1987 to 2000, the Rowes' transfers were not repaid in full.

Tennessee residents, pursuant to Tenn. Code Ann. sec. 67-2-101 (2000), are taxed on the receipt of dividends and interest. Promissory notes that mature in 6 months or less are, pursuant to Tenn. Code Ann. sec. 67-2-101(1)(B)(i), exempt. To avoid the tax on interest and dividends, petitioner and the Rowes took the position that the transfers were demand notes. Petitioner, however, reported the transfers as long-term liabilities, on its financial statements, to avoid violating loan agreements with

First Tennessee Bank (FTB) (i.e., petitioner's main creditor) requiring petitioner to maintain a certain ratio of current assets to current liabilities.

In 1989, petitioner's accountant, Wesley Holmes, decided that petitioner needed documentation to support the reporting of the transfers as long-term liabilities. Mr. Holmes determined that the transfers could be reported as long-term liabilities if the Rowes signed a waiver agreeing to forgo repayment for at least 12 months. From 1989 through 2000, the notes to petitioner's financial statements disclosed that "The stockholders have agreed not to demand payment within the next year", and in 1992 and 1993, the Rowes signed written agreements stating that they would not demand repayment of the transfers (waivers). Despite these disclosures and agreements, the Rowes demanded and received seven partial repayments totaling $1,105,169.

Petitioner recorded in its books and records, all transfers as "notes payable - stockholders" and reported, on its Federal income tax returns, the monthly payments to stockholders as an interest expense deduction. Consistent with petitioner's treatment of the monthly payments, the Rowes reported (i.e., on their individual income tax returns), these payments as interest income. Outstanding "notes payable - stockholders" delineated in petitioner's 1986 financial statements totaled $209,500 and

reached a high of $1,779,169 in 1991. In 1993, Richard Rowe, Jr., and Joseph Tidwell made a transfer of $25,000 and $18,000, respectively, but also demanded repayment of $110,000 and $26,000, respectively, for education expenses. In 1998, Donna Rowe demanded repayment of $180,000 for boat repairs. Mr. Rowe, in 1994 and 1995, demanded repayment of $15,000 and $650,000, respectively, to pay his taxes and purchase a home. Mr. Rowe also demanded repayment of $84,948, $80,000, $25,000, and $70,221 in 1997, 1998, 1999, and 2000, respectively, to pay litigation, boat repair, and tax expenses. The Rowes, in 1997 and 1998, made additional transfers to petitioner of $500,000 and $300,000, respectively. The balance of "notes payable - stockholders" on December 31, 2000, totaled $1,166,912.[2]

In 1993, Mr. Holmes determined that a promissory note should be executed for a portion of the previously undocumented transfers from the Rowes. Petitioner, on December 31, 1993, executed a promissory note (1993 note) with Donna Rowe for $201,400 (i.e., her outstanding balance) of the $1.5 million total outstanding balance of the transfers. The 1993 note was payable on demand, was freely transferable, had no maturity date or payment schedule, and had a stated interest rate of 10

---

[2] This amount also reflects a net decrease of $214,088 that was reported in 1992. The record, however, is not clear as to how many transfers and/or repayments were made during that year or which stockholders were involved in the 1992 transactions.

percent.  On November 21, 1995, petitioner executed a promissory note (1995 note) with Mr. Rowe for $605,681 (i.e., his outstanding balance) of the $807,081 total outstanding balance of the transfers.  The 1995 note was payable on demand, was freely transferable, had no maturity date or payment schedule, and had a stated interest rate of 10 percent.

On January 1, 1998, when the outstanding transfers totaled $1,222,133, petitioner executed two written line of credit agreements with the Rowes for $1,000,000 and $750,000.  The line of credit agreements provided that the balances were payable on demand, and the notes were freely transferable.  In addition, the agreements provided a stated interest rate of 10 percent and had no maturity date or payment schedule.

Petitioner was profitable, and numerous banks sought to lend petitioner money.  As a result, FTB worked diligently to retain petitioner's business, made funds immediately available upon petitioner's request, and was willing to lend petitioner 100 percent of the transferred amounts.  FTB, however, required petitioner to subordinate (i.e., to FTB's outstanding loans with petitioner) all transfers.

In 1993, FTB lent petitioner $1,850,000.  The loan agreement stated "no payments shall be made by Borrower to satisfy any * * * [stockholder] indebtedness for so long as the Loans shall remain unpaid."  Petitioner, however, made partial repayments to

stockholders while FTB loans remained outstanding.  On November 21, 1995, when the prime rate was 8.5 percent, petitioner borrowed $650,000 from FTB, at 7.5 percent, to pay Mr. Rowe.  In 1997, petitioner and FTB executed a promissory note for $1,000,000 that was modified in 1998.  The interest rate on the note was below the prime rate.  At the time the petition was filed, petitioner's principal place of business was located in Millington, Tennessee.

## OPINION

Respondent contends that petitioner's interest expense deductions relating to payments made to the Rowes should be disallowed because the transfers were capital investments and not loans.  Petitioner contends that the transfers were loans.

Taxpayers are entitled to a deduction for payments made on bona fide indebtedness that relates to an existing, unconditional, and legal obligation to repay.  Sec. 163(a); Burrill v. Commissioner, 93 T.C. 643 (1989).  Petitioner bears the burden of proving that the transfers are debt and not equity.[3]  Rule 142(a); Smith v. Commissioner, 370 F.2d 178, 180 (6th Cir. 1966), affg. T.C. Memo. 1964-278.

Transfers between related parties are examined with special scrutiny when taxpayers contend that such transfers are loans.

---

[3] Sec. 7491(a) is inapplicable because petitioner does not meet the net worth requirements of sec. 7430(c)(4)(A)(ii), which are cross-referenced in sec. 7491(a)(2)(C).

Roth Steel Tube Co. v. Commissioner, 800 F.2d 625, 630 (6th Cir. 1986), affg. T.C. Memo. 1985-58. In determining the economic reality of a related party transfer, "'the ultimate issue is * * * whether the transaction would have taken the same form had it been between the corporation and an outside lender'". Fed. Express Corp. v. United States, 645 F. Supp. 1281, 1290 (W.D. Tenn. 1986) (quoting Scriptomatic, Inc. v. United States, 555 F.2d 364 (3d Cir. 1977)). The more a transfer appears to result from an arm's-length transaction, the more likely the transfer will be considered debt. Bayer Corp. v. Mascotech, Inc., 269 F.3d 726, 750 (6th Cir. 2001).

In distinguishing between debt and equity, courts also analyze whether the contemporaneous facts establish an unconditional obligation to repay. Roth Steel Tube Co. v. Commissioner, supra at 630; Smith v. Commissioner, supra at 180; see Burrill v. Commissioner, supra at 669. In Roth Steel, the Court of Appeals for the Sixth Circuit used an 11-factor test to determine whether the transfer was debt or equity.[4] No factor is

---

[4] The 11 factors are: (1) Identity of interest between creditor and stockholder, (2) adequacy or inadequacy of capitalization, (3) source of payments, (4) name given instruments evidencing indebtedness, (5) presence or absence of fixed maturity date and schedule of payments, (6) presence or absence of a fixed rate of interest and interest payments, (7) presence or absence of security, (8) inability to obtain outside financing, (9) subordination of transfers, (10) presence or absence of a sinking fund, and (11) extent to which the transfers were used to acquire capital assets. Roth Steel Tube Co. v.
(continued...)

controlling or decisive by itself and the particular circumstances of each case must be considered by the court.  Roth Steel Tube Co. v. Commissioner, supra at 630.  "These factors are merely tools to be used in evaluating whether the transaction as a whole was effected with a genuine intention to create a debt, with a reasonable expectation of repayment, and within the economic realities of a debtor-creditor relationship."  Recklitis v. Commissioner, 91 T.C. 874, 905 (1988).

I.    The Rowes' Objectives for Characterizing the Cash Transfers as Debt

The Rowes' characterized the cash transfers as debt because they wanted to receive a 10-percent return on their investment and minimize estate taxes.  Mr. Rowe testified that they received advice from numerous estate planners and decided to characterize the transfers as loans because "we felt additional equity would only hurt the family at our death."  For nearly 12 of the 14 years, from 1987 to 2000, the 10-percent rate charged by the Rowes was above the market and prime interest rates.  For example, in 1998 when the prime rate was 8.5 percent, petitioner executed loan agreements with the Rowes and FTB at fixed rates of 10 and 7.5 percent, respectively.  Mr. Rowe testified, unconvincingly, that the higher rate charged by the Rowes

---

⁴(...continued)
Commissioner, 800 F.2d 625, 630-632 (6th Cir. 1986), affg. T.C. Memo. 1985-58.

balanced out over time because the prime rate fluctuated above and below 10 percent. The prime rate, however, exceeded 10 percent only from November 28, 1988, to January 8, 1990. Indeed, the prevailing interest rate was irrelevant. The Rowes simply wanted to receive a 10-percent return.

## II. Petitioner and the Rowes Manipulated Facts and Violated Legal Agreements

To avoid being subject to the Tennessee tax on interest and dividends, petitioner and the Rowes took the position that the transfers were demand notes. Petitioner, however, reported the transfers as long-term liabilities on its financial statements. Mr. Holmes readily admitted that the transfers were reported incorrectly. In addition, petitioner and Mr. Holmes knowingly mischaracterized the transfers as long-term liabilities to comply with FTB's loan agreements.

To justify the reporting of the transfers as long-term liabilities, petitioner and the Rowes executed annual waivers. Mr. Rowe, however, testified that he did not consider the waivers to be legally binding and that the waivers would not prevent petitioner from repaying him on demand. While the waivers were disclosed in the financial statements from 1989 to 2000, petitioner paid the Rowes on demand.

Mr. Rowe also testified that the informal undocumented agreements with petitioner were consistent with a history of "handshake deals" he had with petitioner and other business

associates.  His testimony, however, was contradictory, inconsistent, and unconvincing.  For example, Mr. Rowe testified that either "a handshake" or "a signature" was sufficient to bind him to an agreement.  Yet, he readily failed to honor his "agreements" not to demand repayment.  In addition, despite the FTB loan restrictions on repayments to stockholders, when the Rowes needed cash for personal needs, petitioner paid them on demand.  In essence, the Rowes simply wanted to receive a 10-percent return on, and ready access to, the transferred funds.  As a result, petitioner, along with the Rowes, manipulated facts to attempt to make the transfers appear as debt and avoid certain legal consequences.

III. The Transactions Were Not Arm's Length

The transfers between petitioner and the Rowes were not arm's-length transactions.  First, because the Rowes wanted a 10-percent return, the interest rate paid by petitioner was above the market and prime rates for almost 12 years.  Second, the Rowes began transferring funds to petitioner in 1987 but did not begin reducing the "handshake deals" to a writing until December 31, 1993, and the outstanding balance was not fully documented until November 21, 1995.  In 1997, the Rowes made additional transfers, but they were not evidenced by a writing until 1998.  Third, petitioner and the Rowes executed waivers that were violated, and, at their convenience, considered nonbinding.

Thus, the transactions between petitioner and the Rowes did not take the same form as transactions between unrelated parties.

IV.   The Roth Steel Test

In addition to the transfers not being arm's-length transactions, the 11-factor test set forth in Roth Steel Tube Co. v. Commissioner, 800 F.2d 625 (6th Cir. 1986), establishes that the transfers were equity.  First, petitioner did not pay any formal dividends.  Jaques v. Commissioner, 935 F.2d 104, 106 (6th Cir. 1991), affg. T.C. Memo. 1989-673.  Second, pursuant to 12 consecutive years of waivers, there was no fixed maturity date or fixed obligation to repay.  Roth Steel Tube Co. v. Commissioner, supra at 631; Jaques v. Commissioner, supra at 108 (stating that a taxpayer's failing to repay debt within a reasonable time and making "sporadic" principal payments are factors that weigh in favor of equity).  Third, Mr. Rowe testified that petitioner was expected to make a profit and that repayment "has to come from corporate profits or else the company couldn't pay for it."  Roth Steel Tube Co. v. Commissioner, supra at 631 (stating "An expectation of repayment solely from corporate earnings is not indicative of bona fide debt regardless of its reasonableness." (citing Lane v. United States, 742 F.2d 1311, 1314 (11th Cir. 1984))).  Fourth, the transfers were unsecured.  Roth Steel Tube Co. v. Commissioner, supra at 631.  Finally, petitioner never established a sinking fund.  Id. at 632.  These factors certainly

outweigh the factors in favor of characterizing the transfers as debt (e.g., petitioner reported the payments on its Federal income tax returns as interest expense, external financing was available, petitioner was adequately capitalized, the transfers were not subordinated to all creditors, and the Rowes did not make the transfers in proportion to their respective equity holdings). Moreover, petitioner failed to establish that, at the time the transfers were made, it had the requisite unconditional and legal obligation to repay the Rowes (e.g., the transfers were not documented). Thus, we conclude that the Rowes' transfers were equity. Accordingly, petitioner is not entitled to an interest expense deduction relating to the years in issue.

Respondent also determined that petitioner is liable for a section 6662(a) accuracy-related penalty. The penalty applies to the portion of petitioner's underpayment that is attributable to a substantial understatement of income tax. Sec. 6662(b)(2). Respondent established that petitioner understated its income tax liability, and thus, respondent has met his burden of production, pursuant to section 7491(c). Petitioner, however, failed to address this issue on brief and did not present any credible evidence to establish that it acted in good faith or that there was reasonable cause for claiming the interest expense deductions. Accordingly, the accuracy-related penalty is applicable to the underpayment attributable to the stockholder

payments.

Contentions we have not addressed are irrelevant, moot, or meritless.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.