T.C. Memo. 1997-194


UNITED STATES TAX COURT


ROGER E. GOODRICH AND SUZANNE B. GOODRICH, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 22249-94.                    Filed April 28, 1997.


<u>Thomas M. Thompson</u>, for petitioners.

<u>S. Mark Barnes</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


SWIFT, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' joint Federal income taxes for 1988, 1989, and 1990,
as follows:

| Year | Deficiency |
|------|------------|
| 1988 | $12,479 |
| 1989 | 8,710 |
| 1990 | 1,414 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All references to petitioner are to Roger E. Goodrich.

The only issue for decision involves petitioners' entitlement under section 166 to a claimed $184,874 business bad debt deduction.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. When the petition was filed, petitioners resided in Heber City, Utah.

In 1978, petitioner and two other individuals formed Applied Information Systems (AIS) as a Utah corporation. AIS was engaged in the business of computer software development. In 1986, petitioner sold all of his stock in AIS for $750,000 in cash, and petitioner transferred the $750,000 into an account with Merrill Lynch in the name of a family trust (family trust account). Prior to the sale of AIS, petitioners had established the family trust as a grantor trust for estate planning purposes.

On October 13, 1986, petitioner purchased from Robert E. Wilcox (Wilcox) for $232,511 all of the outstanding stock of Ultimate Intermountain (UI). UI was engaged in the business of distributing computer hardware.

On October 16, 1986, in partial payment of the $232,511 purchase price for the shares of stock of UI, petitioner paid Wilcox $125,000 from the family trust account. Eventually, on April 28, 1989, petitioner's obligation to pay Wilcox the $107,511 balance due on the purchase of the stock of UI was satisfied by petitioner's transfer to Wilcox of 10,000 shares of stock in a newly formed corporation that petitioner formed as a subsidiary of UI.

After petitioner's purchase of the stock of UI and during the years in issue, UI operated as a developer and seller of computer software and hardware. UI generally sold its computer products to local governments, insurance companies, and bookstores.

Petitioner served as UI's president, and Suzanne B. Goodrich served as UI's secretary. Wilcox continued as a director of UI.

On October 14, 1986, 1 day after petitioner agreed to the purchase of the stock of UI, petitioners transferred $155,475 from the family trust account to UI (1986 transfer). UI used the $155,475 transferred by petitioners to pay salaries of several UI employees and to pay for development of new computer software products.

On March 3 and April 1, 1987, petitioners made additional transfers of $18,000 and $24,000, respectively, from the family trust account to UI (1987 transfers). UI used this total of

$42,000 to pay salaries of its employees, rent, and other business expenses of UI.

The following schedule reflects the dates and amounts of petitioners' 1986 and 1987 transfers of funds to UI:

| Date | Funds Transferred |
|------|-------------------|
| 10/14/86 | $155,475 |
| 03/03/87 | 18,000 |
| 04/01/87 | 24,000 |
| Total | $197,475 |

At the time of petitioners' 1986 and 1987 transfers of funds to UI, no documentation, such as loan agreements or promissory notes, was drafted or executed by petitioners or by UI with regard to the funds petitioners transferred to UI.

An informal understanding existed between petitioner and the officers of UI that petitioners' 1986 and 1987 transfers of funds to UI would be repaid by UI to petitioners only out of UI's future profits.

At petitioner's direction, beginning with the 1986 transfer, UI's accountant maintained a handwritten ledger showing a running balance for the total funds that petitioners transferred to UI. On the handwritten ledger, periodic entries were made to reflect the accrual of alleged interest on the funds that petitioners transferred to UI in 1986 and 1987.

During 1987, petitioner was paid approximately $42,000 by UI. At petitioner's direction, this $42,000 was treated on UI's

books and records as a repayment of principal and as a payment of interest with regard to the funds that petitioners had transferred to UI in 1986 and 1987.  On the handwritten ledger that he maintained, UI's accountant deducted from the balance reflected for the funds UI received from petitioners during 1986 and 1987 the amount of funds UI paid to petitioner during 1987 that purportedly represented the repayment of principal.

Apart from the $42,000 that was paid by UI to petitioner in 1987, petitioners were not paid any other funds by UI as salary or otherwise.

Beginning in 1988, Wilcox apparently made periodic loans to UI that were handled informally between the parties.  UI's accountant recorded these loans as such on UI's books and records, and UI repaid some of Wilcox' loans in full.

On March 31, 1989, 2 years after petitioners' 1987 transfers to UI, UI executed a promissory note (1989 promissory note) with regard to the $197,475 in funds transferred by petitioners to UI in 1986 and 1987.  On the 1989 promissory note, petitioners' family trust was indicated as the creditor.  The 1989 promissory note reflected a debt principal of $184,874, the balance reflected on the accountant's handwritten ledger as of March 31, 1989, with regard to funds UI had received from petitioners.

The 1989 promissory note reflected a term of just under 2 years with a maturity date of January 1, 1991.  The 1989

promissory note provided for fixed interest and was secured by certain UI computer software.

On December 27, 1989, UI obtained a secured loan from the City of Orem, Utah, in the principal amount of $80,000, with repayment of principal and interest at 8.5 percent due over 36 months. Petitioners subordinated the 1989 promissory note to the City of Orem's secured loan. At least through July 31, 1990, UI made payments to the City of Orem on the $80,000 loan.

During 1990, UI began to experience financial difficulty largely caused by UI's inability to sell its new computer software products.

On December 21, 1990, 10 days prior to the maturity date of the 1989 promissory note, UI notified petitioners that it would not be able to pay the $184,874 principal balance reflected on UI's accountant's ledger with regard to the 1989 promissory note. At no time did petitioners take any legal action to collect the $184,874 from UI.

On December 30, 1990, following advice of their tax return preparer and in an attempt to qualify their investment in UI as a section 1244 ordinary loss for 1990, petitioners caused UI to issue additional stock in the name of the family trust in exchange for the $184,874 that allegedly was owed to petitioners or the family trust under the 1989 promissory note.

On July 2, 1991, petitioner in writing urged UI's creditors to accept a plan that would restructure UI's debt obligations.

Under the plan, petitioners agreed to be repaid the funds that UI allegedly owed petitioners only after UI's other creditors had been repaid by UI. UI's debt restructure plan, however, was not accepted by a sufficient number of UI's other creditors to take effect.

By letter dated April 1, 1992, UI issued to its creditors a "Notice of Insolvency and Dissolution", indicating that all secured creditors should execute against their collateral. Petitioners did not execute against the UI computer software that secured the 1989 promissory note.

On petitioners' 1990 joint Federal income tax return, petitioners claimed under section 1244 an ordinary loss of $184,874, relating to the stock that was issued in the name of the family trust in 1990 that related to the principal amount due under the 1989 promissory note. Also, for 1988 and 1989, petitioners claimed net operating loss (NOL) carryback deductions arising from the claimed $184,874 section 1244 ordinary loss deduction for 1990.

On audit for 1990, respondent disallowed petitioners' claimed $184,874 section 1244 ordinary loss deduction and the claimed 1988 and 1989 NOL carryback deductions relating thereto.

At trial and on brief, petitioners disavow the $184,874 section 1244 ordinary loss claimed on their 1990 Federal income tax return with regard to the investment in UI and the 1989

promissory note, and petitioners claim with regard thereto for 1990 a $184,874 business bad debt deduction under section 166 and NOL carryback deductions for 1988 and 1989.

OPINION

Generally, taxpayers are allowed deductions for bona fide debts owed to them that become worthless during a year. Sec. 166(a). Bona fide debts generally arise from valid debtor-creditor relationships reflecting enforceable and unconditional obligations to repay fixed sums of money. Sec. 1.166-1(c), Income Tax Regs. For purposes of section 166, contributions to capital and equity investments in corporations do not constitute or qualify as bona fide debts. Kean v. Commissioner, 91 T.C. 575, 594 (1988).

The question of whether transfers of funds to closely held corporations constitute debt or equity in the hands of the recipient corporations must be decided on the basis of all the relevant facts and circumstances, and taxpayers generally bear the burden of proving that the transfers constituted loans by the taxpayers to the corporations and not equity investments. Rule 142(a); Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980).

Courts have established a list of nonexclusive factors to consider when evaluating the nature of transfers of funds to closely held corporations, as follows: (1) The names given to

the documents evidencing the purported loans; (2) the presence or absence of fixed maturity dates with regard to the purported loans; (3) the likely source of any repayments; (4) whether the taxpayers could or would enforce repayment of the transfers; (5) whether the taxpayers participated in the management of the corporations as a result of the transfers; (6) whether the taxpayers subordinated their purported loans to the loans of the corporations' creditors; (7) the intent of the taxpayers and the corporations; (8) whether the taxpayers who are claiming creditor status were also shareholders of the corporations; (9) the capitalization of the corporations; (10) the ability of the corporations to obtain financing from outside sources at the time of the transfers; (11) how the funds transferred were used by the corporations; (12) the failure of the corporations to repay; and (13) the risk involved in making the transfers.  Calumet Indus. Inc. v. Commissioner, 95 T.C. 257, 285 (1990); Dixie Dairies Corp. v. Commissioner, supra at 493.

The above factors serve only as aids in evaluating whether taxpayers' transfers of funds to closely held corporations should be regarded as risk capital subject to the financial success of the corporations or as bona fide loans made to the corporations. Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968).  No single factor is controlling.  Dixie Dairies Corp. v. Commissioner, supra at 493.

Transfers to closely held corporations by controlling shareholders are subject to heightened scrutiny, and labels attached to such transfers by the controlling shareholders through bookkeeping entries or testimony have limited significance unless these labels are supported by objective evidence. Fin Hay Realty Co. v. United States, supra at 697; Dixie Dairies Corp. v. Commissioner, supra at 495.

An expectation of repayment solely from corporate earnings generally is not indicative of a bona fide loan. Roth Steel Tube Co. v. Commissioner, 800 F.2d 625, 631-632 (6th Cir. 1986), affg. T.C. Memo. 1985-58.

Petitioners argue that all of the funds that petitioners transferred to UI during 1986 and 1987 constituted loans and that the 1989 promissory note reflected a bona fide business loan made by petitioners that became worthless in 1990 and that therefore qualifies for a business bad debt deduction.

Respondent argues primarily that each of petitioners' transfers of funds to UI should be treated as a contribution to the capital of UI, and therefore, that petitioners should not be allowed the claimed $184,874 bad debt deduction under section 166. Alternatively, respondent argues that if any portion of petitioners' transfers of funds to UI constituted bona fide loans for the years in issue, that portion should be treated as nonbusiness loans that did not become completely worthless in

1990. We agree with respondent with regard to respondent's primary argument.

On the basis of our analysis of the above factors from Dixie Dairies Corp. v. Commissioner, supra, that apply to the facts of this case, we conclude that petitioners' 1986 and 1987 transfers to UI should be treated as contributions to the capital of UI and not as bona fide loans.

When petitioners made the 1986 and 1987 transfers of funds totaling $197,475 to UI, no loan agreements or promissory notes were drafted or executed. Not until March of 1989, 2 years after petitioners' last transfer was made to UI, did UI execute the 1989 promissory note made payable to the family trust.

An understanding existed between petitioner and the officers of UI that petitioners would not enforce repayment of the funds transferred to UI unless UI became profitable and that any such repayment would be made only out of UI's profits. The fact that repayment of petitioners' transfers depended upon UI's financial success indicates that the 1986 and 1987 transfers did not constitute bona fide loans. See Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d 634, 639 (11th Cir. 1984), affg. T.C. Memo. 1982-314; Estate of Mixon v. United States, 464 F.2d 394, 405 (5th Cir. 1972).

Also, petitioners never demanded repayment of the 1986 and 1987 transfers or executed against the collateral with regard to the 1989 promissory note. Petitioners' inaction tends to refute

the existence of a valid debtor-creditor relationship between UI and petitioners with regard to the 1986 and 1987 funds transferred to UI.

The 1989 promissory note was subordinated to the loans of UI's creditors.  During the years in issue, UI did repay creditors, such as Wilcox and the City of Orem, in preference to making payment on its alleged debt obligation to petitioners.  See Roth Steel Tube Co. v. Commissioner, supra at 631-632; United States v. Henderson, 375 F.2d 36, 40 (5th Cir. 1967).

Petitioner's stated intent and the entries in UI's books with regard to the 1986 and 1987 transfers of funds from petitioners are not consistent with the weight of the objective evidence in this case.

The record provides incomplete information with regard to UI's debt-equity ratio for the years in issue, and we give this factor no weight in our analysis.

The evidence does not support a conclusion that the $42,000 in funds that UI distributed to petitioner in 1987 constituted repayments of principal or interest.

Based on the evidence and considering petitioners' burden of proof, we conclude that petitioners' 1986 and 1987 transfers to UI did not constitute bona fide loans, and therefore, that the transfers should be treated as capital contributions rather than loans.  For 1990, petitioners may not deduct the claimed $184,874 as a bad debt under section 166.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.